AO 91 (Rev. 11/11)  Criminal Complaint

FILED
DISTRICT OF WYOMING
U.S. DISTRICT COURT

AUG 26 2014

U.S. MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
### for the
### District of Wyoming

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. 4-MJ-57-C |
| ) | NP14086555 / |
| ANDREAS MEISSNER, aka ANDREAS MEIBNER ) | |
| ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____07/17/2014 - 08/03/2014_____ in the county of _____Teton_____ in the
_____ District of _____Wyoming_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 36 C.F.R. §1.5(f) | Violating a(n) activity restriction, i.e. launching, landing or operating an unmanned aircraft |
| 36 C.F.R. §5.5(a) | Commercial filming and still photography activities |
| 36 C.F.R. §2.22(a)(2) | Leaving property unattended for longer than 24 hours |
| 36 C.F.R. §2.32(a)(4) | Knowingly giving a false report for the purpose of misleading a government employee or agent in the conduct of official duties |

This criminal complaint is based on these facts:

The affidavit of National Park Service Park Ranger Steven G. Noh is incorporated herein by reference.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Steven G. Noh, National Park Service Park Ranger
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____8 - 26 - 14_____

_____
*Judge's signature*

City and state: _____Yellowstone National Park, Wyoming_____

Honorable Mark Carman, U.S. Magistrate Judge
*Printed name and title*

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. NP14086555 |
| | ) | |
| ANDREAS MEISSNER, | ) | |
| aka ANDREAS MEIBNER | ) | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Steven G. Noh, being first duly sworn, hereby depose and state as follows:

I. INTRODUCTION

1. I am employed full-time by the National Park Service (NPS) as a Seasonal Law Enforcement Park Ranger assigned to the Snake River District, Yellowstone National Park. As a Seasonal Law Enforcement Park Ranger, I hold a Type II Law Enforcement Commission and have been commissioned since May 2014.[1]

2. NPS employees with a Type II Commission have the law enforcement authority to investigate crimes, detain suspects, and apprehend offenders against the laws of the United States, pursuant to the General Authorities Act (16 U.S.C. §1a-6). The Act states that "the Secretary of Interior is authorized to designate, pursuant to standards prescribed in regulations by the Secretary, certain officers or employees of the Department of Interior who shall maintain law and order and protect persons and property within areas of the National Park System."

3. Persons issued Type II Commissions may, as outlined in NPS Law Enforcement Reference Manual 9 (RM-9, Chapter 2, Section 2.2.2), "Participate in the execution of arrest and search warrants, and other process, both inside and outside of park boundaries, when under the

---

[1] From May 2013 through September 2013, I held a Type II Law Enforcement Commission as an NPS Seasonal Law Enforcement Park Ranger assigned to the Canyon District, Yellowstone National Park.

on-scene direction of a Type I Commissioned employee." Since receiving my Type II

Commission in May 2014, I have conducted patrol operations and investigations primarily in the

Snake River District, Yellowstone National Park, under the direct supervision of NPS Law

Enforcement Park Rangers Christopher Flesch[2] and Bradley Jones, both Permanent Type I

Commissioned employees.


II. <u>FEDERAL LAW ENFORCEMENT TRAINING AND EXPERIENCE</u>

      4.   To become eligible for the issuance of a Type II Commission, I was required to

attend and successfully complete an approved NPS Seasonal Training Academy (RM-9, Chapter

5, Section 1.4.1). In July 2012, I received a Certificate of Training for completing the 400-hour

Seasonal Law Enforcement Training Program (SLETP) at Colorado Northwestern Community

College (CNCC), Rangely, Colorado.[3] Upon completion of my training at CNCC, I also

received the Outstanding Overall Student Award for Academics, Academy Skills and Physical

Fitness.

      5.   Prior to attending CNCC, I was employed full-time as a Special Agent for the

Federal Bureau of Investigation (FBI). For most of my 11.5 years as an FBI Special Agent, I

was assigned to the Los Angeles Field Office, and I specialized in investigating classified

counterintelligence, intelligence and criminal public corruption matters.

      6.   As a counterintelligence agent, I received advanced training in electronic and

physical surveillance and countersurveillance techniques, and I applied what I learned to conduct

sophisticated covert operations, with significant, measurable success in advancing complex

---

[2] NPS Law Enforcement Park Ranger Christopher Flesch transferred out of Yellowstone National Park in July 2014 to accept a position as an NPS Supervisory Park Ranger at Glen Canyon National Recreation Area.

[3] At the time, CNCC was and is, as of the date of this affidavit, accredited by FLETA, the Federal Law Enforcement Training Accreditation.

National Security investigations into foreign intelligence activities of non-U.S. and U.S. Persons within the United States. In connection with two highly sensitive National Security matters, I received a letter from the FBI Director as recognition for my investigative efforts.

7. As an intelligence agent assigned to the FBI Los Angeles Field Office, I coordinated post-9/11 intelligence sharing initiatives with U.S. Intelligence Community (USIC) members in conjunction with FBI Headquarters and with formal certification by the Director of National Intelligence (DNI). I provided training and guidance to hundreds of FBI Special Agents and Analysts and other USIC members assigned to counterintelligence and counter-terrorism matters in the use of separate but parallel internal government computer networks populated with content provided by members throughout the USIC, including case officers and analysts from the Central Intelligence Agency and the National Security Agency. These computer networks were designed for security reasons to independently accommodate all classification levels ranging from UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO) to TOP SECRET/SENSITIVE COMPARTMENTED INFORMATION (TS/SCI).

8. Beginning with my training as a New Agent at the FBI Academy, Quantico, Virginia, and throughout the years that followed, I received training on evidence collection and handling consistent with the Federal Rules of Criminal Procedure. Specifically, with regard to all forms of computer and electronic media, I learned special collection and handling procedures were required for evidentiary purposes, and I became familiar with and utilized the services and capabilities of the FBI's Computer Analysis Response Team, also known as CART. FBI Special Agents and other support personnel assigned to CART, operating within a network of Regional Computer Forensics Laboratories throughout the country, "analyze a variety of digital media—including desktop and laptop computers, CDs/DVDs, cell phones, digital cameras, digital media

players, flash media, etc.—lawfully seized as part of our investigations...even when the media is damaged by the forces of nature or by defendants attempting to prevent data from being recovered."[4]

9.   Based upon my knowledge, training and experience, I know that searching for information stored in computers and on electronic media often requires the agent to seize most or all electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is often necessary to ensure the accuracy and completeness of such data[5] and to prevent the loss of the data either from accidental or intentional destruction (both from external sources or from destructive code imbedded in the system as a "booby trap").

10. Additionally, computer and electronic storage devices can store the equivalent of millions of pages of information, and a suspect may try to conceal criminal evidence - he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime, and this sorting process can take weeks or months, depending on the volume of data stored.

11. Based upon my knowledge, training and experience, I also know the forensic analysis of a hard drive (or other computer media) is typically a two-step process: *imaging*, in which the entire hard drive is copied – including all files, slack space, Master File Table, and metadata in exactly the order they appear on the original – and *analysis*, in which the copy of the electronic storage media is searched for data that falls within the scope of the warrant. When it

---

[4] http://www.fbi.gov/news/stories/2013/january/piecing-together-digital-evidence

[5] Modern operating systems, for example, continually read from and write to the hard disk, changing some of the information recorded there; thus, the simple act of using a computer might alter the evidence record on the hard drive.

comes necessary for an investigator to personally examine a computer file to determine whether it falls within the scope of the warrant, the investigator will take all necessary steps to analyze the file thoroughly but will stop the examination of that file as soon as it becomes clear the warrant does not apply to that file.[6]

## III. BROADCAST JOURNALISM TRAINING AND EXPERIENCE

12. In May 1989, I received a Bachelor's Degree in Broadcast Journalism and Political Science, and during the years that followed, I was employed as both an on-air radio and television news reporter, acquiring extensive experience in audio and video production for breaking news coverage and longer format documentaries.

13. After receiving my degree and for approximately three years, I was employed full-time and under contract by Capital Cities / ABC Inc. as an on-air television news reporter assigned to KABC-TV Channel 7 Eyewitness News, a network owned-and-operated station in Los Angeles, California.[7] Los Angeles was and remains ranked as the second largest local television market in the country.[8]

14. As an on-air television reporter, I covered history-making news events in the Greater Los Angeles area, including the Los Angeles Riots, Northridge Earthquake and the O.J. Simpson Case. I gathered information, conducted interviews, wrote news copy, scripted and supervised video editing, and made live and recorded on-camera appearances under deadline

---

[6] *"Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations / Computer Crime and Intellectual Property Section / Criminal Division"* published as the third edition in 2009 by Office of Legal Education, Executive Office for United States Attorneys.

[7] KABC-TV Los Angeles, now commonly known as ABC7 Los Angeles, is currently owned by the Disney / ABC Television Group.

[8] Market rankings as published in 2014 by the Nielsen Company (http://www.nielsen.com/content/dam/corporate/us/en/docs/solutions/measurement/television/2013-2014-DMA-Ranks.pdf)

pressure for newscasts throughout the day and evening. I also received an Emmy Nomination in April 1993 for Light Mini-Documentaries from the local chapter of the Academy of Television Arts And Sciences.

15. In addition to my radio and television experience, I was intermittently self-employed over the course of approximately three years as the owner and operator of a sports video production company. I operated and became proficient with a professional digital video camera system, a camera stabilizer system, and digital video editing software,[9] with familiarity in all phases of the pre- and post-production workflow required to produce videos in support of sports instruction and on-line product and service promotion.

IV. SUMMARY OF CRIMINAL COMPLAINT

16. The statements in this affidavit are based on information provided by the investigation to date and on my training and experience as an FBI Special Agent, an NPS Seasonal Law Enforcement Park Ranger, a former television news reporter, and a video production company owner and operator. Additionally, the information set forth in this affidavit concerning the investigation at issue is known to me as a result of my own involvement in the investigation or has been provided to me by other law enforcement professionals.

17. I have not included in this affidavit each and every fact known to me concerning this investigation. Rather, it contains only the facts I believe are necessary to establish probable

---

[9] Video production and editing gear included CAMERA (JVC GY-HM700U 3-CCD ProHD Video Camcorder w/14x Canon Lens), CAMERA STABILIZER SYSTEM (Steadicam Flyer24-LE), TRIPOD (Sachtler Speed Lock 75CF w/FSB-6T Fluid Head), WIRELESS AUDIO SYSTEM (Sennheiser EW 100 G3 ENG Dual Basic Kit), PORTABLE LIGHTING SYSTEM FOR STEADICAM USE (BLN-10 Lowel Blender LED Lights), EDITING HARDWARE (Apple Mac Pro Dual 2.93 GHz Quad-Core Intel XE), and EDITING SOFTWARE (Apple Final Cut Studio 3).

cause in support of a criminal complaint against ANDREAS MEISSNER, aka ANDREAS

MEIBNER, for violation of the following:

      a.   Code of Federal Regulations, Title 36 - Parks, Forests, and Public Property

(36 CFR), Chapter I – National Park Service, Department Of The Interior, Part 1 – General

Provisions, §1.5(f), *Violating a closure, designation, use or activity restriction or condition,*

*schedule of visiting hours, or public use limited is prohibited.* [10]  More specifically, the 2014

Yellowstone National Park Superintendent's Compendium states, "*Launching, landing or*

*operating an unmanned aircraft([11]) from or on lands and waters administered by the National*

*Park Service within the boundaries of Yellowstone National Park is prohibited except as*

*approved in writing by the Superintendent.* "[12]

[10] The authority to designate areas for a specific use or activity or impose conditions or restrictions on a use or activity is found in **§1.5 Closures and public use limits.** (a) Consistent with applicable legislation and Federal administrative policies, and based upon a determination that such action is necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, aid to scientific research, implementation of management responsibilities, equitable allocation and use of facilities, or the avoidance of conflict among visitor use activities, the superintendent may: (2) Designate areas for a specific use or activity, or impose conditions or restrictions on a use or activity.

[11] The U.S. Department of the Interior NPS Policy Memorandum 14-05, issued by NPS Director Jonathan B. Jarvis and date stamped June 19, 2014, states, *"The term 'unmanned aircraft' means a device that is used or intended to be used for flight in the air without the possibility of direct human intervention from within or on the device, and the associated operational elements and components that are required for the pilot or system operator in command to operate or control the device (such as cameras, sensors, communication links). This term includes all types of devices that meet this definition (e.g., model airplanes, quadcopters, drones) that are used for any purpose, including for recreation or commerce."*

[12] The 2014 Yellowstone National Park Superintendent's Compendium signed by NPS Superintendent Dan Wenk and by NPS Acting Chief Ranger Bonnie Schwartz (for NPS Chief Ranger Tim Reid) on June 20, 2014 further states, *"The Superintendent has determined that unmanaged or unrestricted recreational use of UAs (Unmanned Aircraft) within Yellowstone National Park will conflict with, or impact, a variety of park uses including visitor experience of unimpaired view sheds; the disturbance, displacement or harassment of park wildlife to include threatened and endangered species present potential for impacts or damage to sensitive geothermal areas; creation of public safety hazards per operation near roadways or large aggregations of visitors, and visual or aural impacts to wilderness character and values within the park backcountry. Less restrictive measures were not considered sufficient due to the rapidly expanding and evolving use of UAs throughout the world."* The latest version of the 2014 Compendium, signed on June 20, 2014, with the language excerpted above, was uploaded to the Yellowstone National Park website on July 11, 2014

(http://www.nps.gov/yell/parkmgmt/upload/YELL_Supt_Comp_2014_June20_Final.pdf) and is available for public viewing on the Internet.

b. 36 CFR, Chapter I, Part 5, §5.5(a), *Commercial filming and still photography activities are subject to the provisions of 43 CFR part 5, subpart A. Failure to comply with any provision of 43 CFR part 5 is a violation of this section.* [13]

c. 36 CFR, Chapter I, Part 2, §2.22(a)(2), *Leaving property unattended for longer than 24 hours.*

d. 36 CFR, Chapter I, Part 2, §2.32(a)(4), *False Report - Knowingly giving a false report for the purpose of misleading a government employee or agent in the conduct of official duties.*

---

[13] According to **43 CFR Public Lands: Interior, Part 5 - COMMERCIAL FILMING AND SIMILAR PROJECTS AND STILL PHOTOGRAPHY ON CERTAIN AREAS UNDER DEPARTMENT JURISDICTION, Subpart A - Areas Administered by the National Park Service, the Bureau of Land Management, and the U.S. Fish and Wildlife Service:**

**§5.2 When do I need a permit for commercial filming or still photography?**

(a) All commercial filming requires a permit.
(b) Still photography does not require a permit unless:
    (1) It uses a model, set, or prop as defined in §5.12; or
    (2) The agency determines a permit is necessary because:
    (i) It takes place at a location where or when members of the public are not allowed; or
    (ii) The agency would incur costs for providing on-site management and oversight to protect agency resources or minimize visitor use conflicts.
(c) Visitors do not require a permit for filming or still photography activities unless the filming is commercial filming as defined in §5.12 or the still photography activity involves one of the criteria listed in §5.2 (b).

As excerpted from **§5.12 How are terms defined in this subpart?**

*Commercial filming* means the film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income. Examples include, but are not limited to, feature film, videography, television broadcast, or **documentary** *(emphasis added)*, or other similar projects. Commercial filming activities may include the advertisement of a product or service, or the use of actors, models, sets, or props.

*Permit* means a **written authorization** *(emphasis added)* to engage in uses or activities that are otherwise prohibited or restricted.

*Sets and props* means items constructed or placed on agency lands to facilitate commercial filming or still photography including, but not limited to, backdrops, generators, microphones, stages, lighting banks, camera tracks, **vehicles specifically designed to accommodate camera or recording equipment** *(emphasis added)*, rope and pulley systems, and rigging for climbers and structures. Sets and props also include trained animals and inanimate objects, such as camping equipment, campfires, wagons, and so forth, when used to stage a specific scene. The use of a camera on a tripod, without the use of any other equipment, is not considered a prop.

*Still photography* means the capturing of a still image on film or in a digital format.

*Videography* means the process of capturing moving images on electronic media, e.g., video tape, hard disk or solid state storage.

e.   The violations listed above are Class B Misdemeanors punishable "by a fine as provided by law, or by imprisonment not exceeding 6 months, or both, and shall be adjudged to pay all costs of the proceedings."[14]

## V.  FACTS SUPPORTING PROBABLE CAUSE

### A.  Initial Reporting of a Drone Crash in Yellowstone Lake

18. On July 18, 2014, at approximately 5:00 p.m., Roy E. DeWalt, an NPS Visitor Use Assistant (VUA) assigned to the Grant Village Back Country Office (BCO), Snake River District, Yellowstone National Park, walked into the Grant Ranger Station and told me a drone - a term commonly used for unmanned aircraft - fell into the water in Yellowstone Lake in or near the Grant Marina.[15]

19. Based on (1) my initial interview with DeWalt that afternoon, (2) his handwritten NPS Statement Form completed the following day on July 19, 2014, and (3) my follow-up interview with him on August 01, 2014, DeWalt provided the following information:

a.   On July 18, 2014, at approximately 8:10 a.m., DeWalt entered the BCO and observed his wife Diana (B. DeWalt, an NPS Volunteer In Park (ViP) also assigned to the BCO) *"speaking to a German gentleman who was in distress over a camera that had fallen into the marina area at Grant Village last night 'July 17'. He said he was filming a documentary he had a permit for. I did not see the said permit."* Additionally, Roy E. DeWalt reported, *"The*

---

[14] 36 CFR Chapter I, Part 1, §1.3 Penalties (a)

[15] The Grant Village BCO is immediately adjacent to the Grant Village Visitor Center, and based on estimates provided by Google Maps, the BCO is approximately 0.7 miles by road to the Grant Ranger Station and approximately 1.4 miles by road to the Grant Marina.

*gentleman (did not know his name at this time) said he would pay any expenses for a diver or whatever it took to recover camera and any shipping costs incurred."*

      b.  At approximately 9:00 a.m. that same morning, the German gentleman returned to the BCO and DeWalt *"asked him to repeat how the camera was lost and where. He explained that the camera was mounted on a 'platform' (using his hands to indicated (sic) about (18" x 18") and that it fell off the kayak. I drew a sketch of the marina entrance, he pointed to approximate area where the camera went into the water.(*[16]*) He was not interested (in) the 'platform' or the camera, he really wanted the SD card with all the pictures he took. He then left to pack since he was flying back to Germany that day. He needed to go to F-Lodge at Grant Village(*[17]*) to pack (and he) would come back one more time befor(e) he left Grant."*

      c.  At approximately 9:30 a.m. later that same morning, the gentleman *"returned to the office this time placing a box on the counter.(*[18]*) I realized that the 'platform' was a <u>drone</u> and camer(a) was a GoPro mounted underneath. Realizing I couldn't introduce him to the*

---

[16] DeWalt gave me the sketch when he first reported the drone incident to me at the Grant Ranger Station on July 18, 2014, and it showed an oval that DeWalt told me he drew between four buoys located just outside the East Entrance of Grant Marina. The four buoys are centered approximately around the following Global Positioning System (GPS) coordinates: Universal Transverse Mercator (UTM) North Hemisphere 12 Zone T Band 535878 East 4915590 North. I obtained the coordinates using GPS mapping tools found on the website geoplaner.com.

[17] On August 01, 2014, I interviewed Linda Mead, the Front Desk Manager at the Grant Registration Building in Grant Village. At my request, Mead searched reservation records for all properties in Yellowstone National Park managed by Xanterra Parks and Resorts (an authorized concessioner in Yellowstone National Park), and she found a record under the name GRITZ, OLIVER/CATHERINE for the Grant Village Lodges, Room 6226 (indicating F Lodge, Room 226), with an arrival date of July 17, 2014 and a departure date of July 18, 2014. F Lodge is one of six lodges in Grant Village, numbered A through F. Investigation showed – and details will be provided below - the name OLIVER GRITZ is associated with ANDREAS MEISSNER. Front Desk Manager Mead found no records for ANDREAS MEISSNER or ANDREAS MEIBNER.

[18] DeWalt gave me the box when he first reported the drone incident to me at the Grant Ranger Station on July 18, 2014. It is a predominantly white box with a red handle, measuring approximately 14.75" W x 8.25" D x 13.00" H and featuring the name "PHANTOM 2 The Spirit of Flight" and a color image of a white unmanned aircraft with red stripes (DeWalt told me the German gentleman said the only difference between the "platform" pictured on the box and his "platform" was that his "platform" did not have red stripes). On a label located on the side of the box are the following lines of text: "PHANTOM 2   Reserved Zenmuse Gimbal Port   Intelligent Flight Battery and Enhanced Flight Time (Up to 25 mins)   Attractive and Highly Integrated Design   Ready-to-Fly   Contains Remote Control Unit (Just add 4X AA Batteries)   Spare Propellers and Other Accessories"

appropriate LE([19]) he again said that whatever the Rangers could do to retrieve the equipment he wou(l)d pay for. At this point all he wanted back was the SD card in the camera which would save the documentary he had been permissioned (sic) to film. I then asked him to give me his contact information name, German address, email and phone number([20]) so we could keep him informed of any progress in recovering SD card. " Additionally, DeWalt reported, "I asked him one last time how incident happened at which point he explained that he was 'flying' the camera no more than 20 meters high as restricted by his permit at which time the battery failed and down it went. He 'paddled' to reach it but it sank too fast!"

20. DeWalt's wife Diana B. DeWalt also completed a handwritten NPS Statement Form on July 19, 2014 regarding her contact with the German gentleman, now tentatively identified as ANDREAS MEISSNER; and I reviewed her written statement with her on August 01, 2014. In it she wrote, "It seems the night before his GoPro camera fell into Yellowstone Lake as he was returning to Grant Marina in his kayak. He said he was filming a documentary. He clarified he had a permit to film this documentary and showed me 2 pages stapled together that mentioned documentary. Knowing this was an LE matter, I did not exam(ine) the papers thoroughly. He said he would pay a diver to retrieve the camera – he was desperate for SD card. I explained that law enforcement were the only ones that could assist and we would do all we could to introduce him to an LE. His English was fairly good – we had no trouble communicating with each other. " Additionally, DeWalt reported, "When we asked again how it

---

[19] "LE" is an abbreviation for Law Enforcement.

[20] DeWalt gave me the contact information handwritten by the German gentleman; and at the time, I believed it read, "ANDREAS MEISSNER LAURENTIUSSTR A2 53639 KOENIGSWINTER GERMANY 0049 177 384 3535 audimeissner@web.de"

*went into water, he clarified that he was flying the device when the battery died and it tumbled into water. But he said, it never went above the 20 meters I was restricted to in the permit."*

### B. Locating and Contacting the Subject ANDREAS MEISSNER

21. On July 18, 2014, at 5:36 p.m.,[21] I sent an electronic message from my U.S. Government e-mail address (associated with my U.S. Department of the Interior computer network account) to the address "audimeissner@web.de". In the message, I identified myself in true name as a "National Park Service Ranger" based in Grant Village, and I asked Mr. Meissner to contact me by telephone at the number for the Grant Ranger Station or by e-mail.

22. The message was rejected by the "web.de" domain for the address "audimeissner@web.de", and I re-sent the same message to the address "andimeissner@web.de" at 5:38 p.m. with no rejection message received.

23. On July 18, 2014, at 5:58 p.m., I sent an electronic message to Drew Beattie, a dispatcher assigned to the NPS Yellowstone Communications Center, asking Beattie if he could place an international telephone call to **0049 177 384 3535** to contact a visitor from Germany who recently left the Park. At 6:19 p.m., Beattie – using his personal cellular telephone linked to his personal Skype™ account – called the number, heard an outgoing message in German, identified himself, and then left a voicemail message in English asking that the individual heard on the outgoing message (1) call the Grant Ranger Station or (2) check e-mail for messages. Beattie said he repeated the same message a second time to ensure the listener would fully understand the request.[22]

---

[21] The dates and local times are recorded and displayed with each e-mail.

[22] I interviewed Drew Beattie via telephone on August 06, 2014 regarding his telephone call to 0049 177 384 3535 on July 18, 2014.

24. On July 18, 2014, at 11:10 p.m., I received an electronic message sent from

"**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the

message read, in part,

> "*As I ve got some problems understanding English on the phone I
> would prefer email if that suits you.*"

25. Based on the information I had available at the time, I initiated a law enforcement

ruse, in which the primary objective - investigating a suspected criminal act or acts – would not

be disclosed to the subject MEISSNER.  The law enforcement ruse is a commonly used

investigative tool when conducting a lawful criminal investigation, and based upon my

knowledge, training and experience, I know the law enforcement ruse is particularly effective

when the subject of the investigation presents indicators of deception resulting from attempts by

the subject to conceal his or her criminal activity.

26. On July 19, 2014, at 11:58 a.m., I sent an electronic message from my U.S.

Government e-mail address to "Andreas Meissner <AndiMeissner@web.de>" asking

MEISSNER for his current location.  I also asked to meet him "to see what we can do about your

Phantom 2."

27. On July 19, 2014, at 2:06 p.m., I received an electronic message sent from

"**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the

message read, in part,

> "*I'm already out. In Seattle. In a few minutes we take off to
> Germany. As ray from the office told me it could be possible to
> dive for that Phantom and than ship it to me? It would be the
> greatest you could do for me. Of course I would pay for that
> efforts.*
>
> *Please let me know what is possible. I ve given the guy in the office
> a detailed description where the Phantom should be in the
> marina.*"

28. On July 19, 2014, at 7:43 p.m., I sent an electronic message from my U.S. Government e-mail address to "Andreas Meissner <andiMeissner@web.de>", and it read, in part, "I have been specially assigned to assist you, and my goal is to maximize everyone's visitor experience, including yours. I hope I can. That I didn't have a chance to meet with you complicates things, but I will do my very best to help."

29. To authenticate my identity, I attached to the message a scanned copy of a redacted version of the front and back of my NPS U.S. Department of the Interior Temporary Employee Card,[23] and I asked MEISSNER to authenticate his identity "so I know I'm in contact with the correct person...A scanned copy of your passport will work well. Also, any permits you have in your possession or other Yellowstone-related documents that feature your name."

30. I also asked MEISSNER to verify his contact information, as listed below:

> ANDREAS MEISSNER
> LAURENTIUSSTR A2
> 53639 KOENIGSWINTER
> GERMANY
> 0049 177 384 3535

31. Finally, I asked MEISSNER to provide a detailed description of what he was doing and where exactly he was at the time. I wrote, "Understanding the circumstances will help focus my efforts on your behalf. I understand of significant interest to you is the retrieval of your smart card. I'll do my best to return it to you, and I hope the water hasn't damaged it to the point where you would not be able to retrieve your content."

---

[23] I redacted the line on the front of the card that listed my Date of Birth.

32. On July 21, 2014, at 6:14 a.m., I received an electronic message sent from

"**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the

message read, in part,

> "*We're usually doing this things very carefully and professionally as I was waiting with it, until no people were at the marina at the time. Unfortunately than I had unexpected technical difficulties. We are professional filmers, which should explain, why using such devices, and why it's so essentially important to get it back.*
>
> *Some words about the project. In this particular case we were not filming on profit purpose. I was asked from the founder of a foundation to do some private documentation about his charity-project. As we've got no money for that, of course, it's even more problematic that we've lost the Phantom and the camera but, especially the files on the card. As the Yellowstone-Management knows, we've been on a cycling tour from Seattle to the Yellowstone Park - the joining fee from the cyclists is 100 percent used for the charity project, which brings children from socially disadvantaged families to free education.*
>
> *Unfortunately I've left all the paper-work in the rental car. But, be sure, we've been allowed to do, what we did, cause I've been speaking to Mr Randy(?) Henderson at the Western park-entrance. He should know about the cycling-project. He told me, that we don't need a filming licence, 'cause we do for non-profit use.*
>
> *I will attach my ID-card, to make shure you are in contact with the right person. Roy Dewalt and his wife frome the office at Lake Village will confirm, that I was in the office, when they will see the picture of mine. Don't be confused by the name 'MeiBner'. It's a special German shortening for 'MEISSNER', which you will find on the ID some lines below.*
>
> *So, the most important thing is to get back the SD-Card but, as it is a 1200 $ device in total, I would really appreciate to get back the whole device (original packing is at Mr. Dewalt in Lake Village office). Especially the stabilizing camera-mount will work despite the water and I'm sure, the camera will as well, after some dry-out. The damaged Phantom will still be fine for spare parts.*
>
> *PS: Adress is almost correct but, house number ist 12 NOT A2*"

C. Investigation into the Permit Question

33. Based on the witness reports and on the information provided by MEISSNER to date, I conducted the following investigation:

a. I reviewed the attachment to the July 21, 2014 e-mail received at 6:14 a.m. and determined the file name with the extension is "Ausweisvorderseite.bmp". The file name is German for "Identification – Front Page"[24] and the file is a bitmap image of what appears to be a scanned color copy of a "FEDERAL REPUBLIC OF GERMANY IDENTITY CARD", number "976177301", featuring a photograph of an adult male, the surname "MEIβNER", the given name "ANDREAS", and date and place of birth "09.05.76 NORDHAUSEN".[25] The names "MEISSNER" and "ANDREAS" are also featured over the border of the photograph and again near the bottom of the image.

b. On July 21, 2014, I interviewed Tammy Wert, NPS Fee & Film Program Manager, Yellowstone National Park, over the telephone, and she told me her office, the Commercial Film Program Office within the Resource and Visitor Protection Division, acts on behalf of the Superintendent of Yellowstone National Park regarding permit matters. I asked Wert whether any (i) special use permits were issued by her office for the operation of unmanned aircraft or whether any (ii) permits for commercial filming, photography or sound recording were issued to "ANDREAS MEISSNER (also spelled ANDREAS MEIBNER) or to…any for- or non-profit still photography and/or video production group from Germany for the month of July 2014…" Wert told me her office did not, and she certified her answer via e-mail by sending the following statement to my U.S. Government e-mail address on July 21, 2014 at 1:49 p.m.:

---

[24] On August 09, 2014, I provided the file name via e-mail to Alexandra Rothermel, an NPS Seasonal Resource Education Park Ranger assigned to the Grant Village Visitor Center, Yellowstone National Park; and she provided the English translation to me the same day, also via e-mail.

[25] The date of birth is May 09, 1976.

"...no permit was issued for commercial filming, photography or any other special use permit to

operate a drone in Yellowstone National Park."

   c. After the interview, Wert sent to my U.S. Government e-mail address copies

of the following three (3) documents:

     i. Terms and Conditions, Non-Profit Bike Tour, SUP # Q-74, one page

     ii. UNITED STATES DEPARTMENT OF THE INTERIOR, National Park

Service, YELLOWSTONE NATIONAL PARK, Special Use Permit, two pages, issued by the

NPS on July 16, 2014 for the following:

| | |
|---|---|
| NAME | Oliver Gritz |
| ORGANIZATION | Run & Ride for Reading |
| ADDRESS | Oberlaender Ufer 172 |
| | Cologne, Germany |
| TELEPHONE NUMBER | **863 546-4116** |

| | |
|---|---|
| Park Alpha Code: | **YELL** |
| Type of Use: | FIRST AMENDMENT |
| Permit #: | **1570 - Q – 0074** |
| **PERMIT VALID:** | **July 17 – 19, 2014** |

| | |
|---|---|
| SUMMARY OF | **Bicycle touring – see attached terms.  $12 per** |
| PERMITTED | **person entrance fee for cyclists: support vehicles** |
| ACTIVITY | **(4) will not be charged.** |

     iii. National Park Service, Yellowstone National Park, PO Box 168,

Yellowstone National Park, WY 82190, Application for Special Use Permit, two pages,

electronically signed by Oliver Gritz, Chairman Run & Ride for Reading, on July 15, 2014, and

submitted with the following information:

| | |
|---|---|
| Applicant Name: | Oliver Gritz |
| Company/Organization | |
|  Name: | Run & Ride for Reading e.V. |
| Tax ID # | German Tax ID 219/5891/2238 |
| Street/Address: | Oberlaender Ufer 172 |
| City/State/Zip Code: | 50698 Cologne Germany |

| | |
|---|---|
| Email: | oliver.gritz@t-online.de |
| Website: | www.run-ride.de |

Description of Proposed
Activity: Charity bicycle tour from Seattle to Yellowstone National Park. Run & Ride for Reading organizes this ride to collect donations to establish 'Reading Clubs' in schools in Germany.

Requested Location(s): Enter Park via West Yellowstone and cycle via HWY 20 and HWY 89 to Grant. Stay in Grant (Grant Village Resort) for two nights and then continue to cycle via HWY 14 in order to leave the Park via the East Exit.

| | |
|---|---|
| Set up begins: | Thu Jul 17 / approx. 2pm |
| Activity begins: | Thu Jul 17 / approx. 2pm |
| Activity ends: | Sat Jul 19 / approx. 3pm |
| Removal completed | Sat Jul 19 / approx. 3pm |

Support equipment 16 cyclists on road racing bikes supported by three passenger cars and one DHL 16' truck **plus one film crew.** *(emphasis added)*

d. In the e-mail sent with the three (3) documents, Wert wrote, "At no time was filming or operating a drone mentioned."

e. On July 25, 2014, NPS Seasonal Law Enforcement Park Ranger Chris Mengak, assigned to the Snake River District, Yellowstone National Park, obtained an NPS Statement Form typed and signed by Randall Henderson, an NPS Supervisory Visitor Use Assistant (VUA) assigned to the West Entrance Station, Yellowstone National Park. In his statement, dated July 24, 2014, Henderson reported speaking to an individual named "*Oliver Gitz*" at the West Entrance Station on July 17, 2014[26] and that the individual "*told me that he had a 'large camera' that he was going to use that in the past has been seen by others as being*

---

[26] Later, in an electronic message I received via my U.S. Government e-mail address on July 27, 2014 at 3:35 p.m., Randall Henderson wrote, "*The name Oliver Gitz was offered to me in the form of written communication through an email showed to me on a white smartphone…I have no memory the individual I spoke with verbally giving me his name.*"

*'commercial.' I replied that I didn't understand his question and asked him to clarify what type*
*of filming he was doing. He said that he wanted to film his group in the park during their*
*'charity event' and that he wanted to know the rules. I responded that filming in the park is*
*limited to people who are using it for personal means, no violating closures, impacting resources*
*or having an adverse effect on park visitors. I also said that since the camera in question in his*
*words were 'a large camera,' I recommended that he contact the number on the bottom of his*
*permit to get clarification of rules and regulations regarding filming in the park."*

### D. The Search for the DRONE in Yellowstone Lake

34. On July 21, 2014, at 2:03 p.m., I sent an electronic message from my U.S.
Government e-mail address to "Andreas Meissner <AndiMeissner@web.de>", asking
MEISSNER to "...click on the link below. Then, in the upper right corner of the image window,
please click on the satellite button. You'll see an image of the Grant Marina.

http://www.geoplaner.com/?z=17;p=44.3924,-110.55158;

Roy and Diana told me you were on the water - on a canoe or kayak - operating the Phantom 2
remotely when the battery failed and the platform crashed into the water. Please show me where
this happened using the satellite image - more specifically, where you were at the time, i.e. the
point from which you were operating the platform, and where the platform hit the water. We
also need to know at what height the platform began to fail because estimating the distance of the
fall and the speed at which it hit the water will help the searchers learn whether the platform sank
straight down or drifted along with the current before reaching the bottom of the Lake."

35. On July 21, 2014, at 4:44 p.m., I received an electronic message sent from

"**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the

message read, in part,

> "*I've tried to find the marina, but I can't. The set waypoint A ist
> somewhere  near San Jose and I'm not sure, where on this map
> I've already been.*
>
> *But from my point of view it's quite less complicated: The
> information, I was on a kajak was wrong.  I was standing on the
> walkway which passes the marina.  My point was approximately in
> the middle beetween Lake Restaurant and the ramp, where people
> can let their boats down. Flight altitude was approx 10 feet only.
> When I saw the device sink, I ran over to it and saw exactly where
> it sunk. So, If the blades were not rotating too long it should be
> here: Aproxx 10 feet away from the bank-wall with the rail and
> almost exactly in the middle where the shore-protection-wall opens
> to let the boats on the lake. So, the area for searching is just in the
> range, where the wall opens to the lake. Maybe a little
> more direction that boat ramp. There are also 2 or 4 buoys in the
> middle which marks the possible area very well. The drawing Roy
> made, shows it very exactely. It's definitely inside the marina, not
> outside in the lake. I was just 10 - 15 feet away on the walkway,
> saw it sinking. Finally, I've attached a picture, on which I've
> marked the area. I think this will work well.*"

36. I reviewed the attachment to the e-mail and determined the file name of the

attachment with the extension is "MarinaPhantom.JPG".  It is an image file of what appears to be

a color photograph of the Grant Marina taken from ground level with the camera pointed in a

Northeasterly direction.  There is an area inside the protection wall on the East end of the Grant

Marina circled in red, with five lines drawn within the area, as marked by MEISSNER.

37. On July 21, 2014, at 6:32 p.m., I sent an electronic message from my U.S.

Government e-mail address to "Andreas Meissner <AndiMeissner@web.de>", provided the

correct link (http://www.geoplaner.com/?z=19;p=44.39232,-110.54914,WP01-A), and wrote,

"Your description of the location is not the area indicated by Roy's diagram,([27]) which is why it is important for you to show me exactly where you believe the Phantom 2 sank. Roy indicated the platform may have gone down much farther away from the marina protection wall and possibly closer to the far buoys. On the satellite image, please indicate where you were standing while operating your platform, and where again, you believe it sank."

38. On July 22, 2014, at 3:57 a.m., I received an electronic message sent from

**"Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the message read, in part,

> "*You may think I'm technically disabled but, again there is only one waypoint near San Jose in your map. However, I can't give you the position more exactly than I did in the photo. It will be a range of about 60 feet in diameter. Maybe it could be an idea that you will set the point that I gave you by the photo as a GPS point onto the map, to make it easier for the searching team. Again, even I won't be able to point it more exactely. As the marina is from the gull until the open wall not more than 80 -100 feet in my oppinion, it should be possible to search within that range.*"

39. On July 22, 2014, at 3:59 a.m., I received an electronic message sent from

**"Konvex TV Andreas Meissner** <andimeissner@web.de>" to my U.S. Government e-mail address, and embedded within the e-mail was a color screenshot of

"http://www.geoplaner.com/?z=19;p=44.39232,-110.54914,WP01-A" that showed a map of a section of Northern California, with Waypoint A marked near San Jose.

40. On August 08, 2014, I conducted an Internet search of "Konvex TV" and

"Andreas Meissner" using the Internet search tool available at Google.com and was led to a website located at "www.konvex.tv". The website's homepage – translated from German to

---

[27] The diagram is a reference to the sketch drawn by Roy E. DeWalt on July 18, 2014 showing an oval drawn between four buoys located just outside the East Entrance of Grant Marina.

English[28] – featured the banner "*KONVEX TV PRODUKTION*" followed by "*Welcome from KONVEX TV OB Reportage, Magazine Articles, Industry Films, Spot Advertisements Internet publishing or Music Videos. Since 2003, we have offered an unaltered high standard in this area of Film and TV production. Naturally also in HD. Talk to us about your project, we will provide a perfect individualized solutions for your budget. Your Konvex Team.*" The Contact page included the name "*Andreas Meißner*", the telephone number "*0177 . 384 35 35*" and the e-mail address "*info@konvex.tv*".

41. On July 22, 2014, at 11:52 p.m., I sent an electronic message from my U.S. Government e-mail address to "Andreas Meissner <AndiMeissner@web.de>", and it read, in part, "…with what you provided, several hours were spent today searching for your Phantom 2. Unfortunately we did not locate it. We were on the water on a boat, using sonar and visual searching techniques, but we were unsuccessfully. We reviewed your photograph with the red circle and your narrative description to pinpoint our search area, but we had no luck.([29]) The conditions were okay but not ideal. We will try again when the weather, winds and light are favorable. In the meantime, may I suggest we try GPS coordinates. Here they are:

---

[28] On August 09, 2014, I provided the original German text via e-mail to Alexandra Rothermel, an NPS Seasonal Resource Education Park Ranger assigned to the Grant Village Visitor Center, Yellowstone National Park; and she provided the English translation to me the same day, also via e-mail. The original German text read, "*Willkommen bei KONVEX TV  Ob Reportage, Magazinbeitrag, Industriefilm, Werbespot, Interneteinspieler oder Musikvideo. Seit 2003 bieten wir in diesen Bereichen der Film -und Fernsehproduktion einen unverändert hohen Standard. Natürlich auch in HD.  Sprechen Sie mit uns über Ihr Projekt, wir liefern ihnen die maßgeschneiderte Komplettlösung für Ihr Budget.  Ihr Konvex Team.*"

[29] On July 22, 2014, Roy E. DeWalt – using his personally owned boat, a 19' Boston Whaler called "The Osprey" - searched for the DRONE for approximately one hour in the morning and another 30 minutes in the afternoon with the aid of a Lowrance HDS-7 Fishfinder / Chartplotter in the area between the four buoys just outside the East Entrance of the Grant Marina, as marked on DeWalt's July 18, 2014 sketch.  The search produced negative results. Later that afternoon, I joined DeWalt on his boat; and between approximately 2:15 p.m. and 3:45 p.m., we continued the search, with a focus on the area within the protection wall at the East end of Grant Marina, as marked in red by MEISSNER on the color photograph sent to me as an e-mail attachment on July 21, 2014 at 4:44 p.m.  We searched with the aid of the same fishfinder / chartplotter, but no DRONE was found.

**UTM N HEMISPHERE**
**12T 535899 X-EA.**
**4915551 Y-NO.**

**dd.ddddd**
**LATITUDE 44.39235 N**
**LONGITUDE -110.54926 E**

**dd mm.mmm**
**44 23.541 N**
**110 32.956 W**

**dd mm ss.s**
**44 23' 32.5" N**
**110 32' 57.3" W**

Enter these numbers into geoplaner.com (or any other GPS mapping website) and you should see

the satellite image of the area.  It wouldn't hurt, Mr. Meissner, to review the image and verify the

exact location where the Phantom 2 entered the water and your relative position."

42. On July 23, 2014, at 6:45 a.m., I received an electronic message sent from

"**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the

message read, in part,

> "*I've now created the link below :*
>
> *http://www.geoplaner.com/?z=18;p=37.31917,-*
> *122.04511;p=44.39206,-110.55112;p=44.39218,-*
> *110.54964;p=44.39223,-110.55025;p=44.39191,-110.55044;*
>
> *Now when I see the satellite-picture, I'm not quite shure anymore,*
> *if the device hasn't  sunk maybe a little earlier, means before the*
> *walkway turns a little to the left. Thats why I've widened the area a*
> *little.*
>
> *B marks my operation point. The 'sinking-area' should be*
> *between D and C.  E marks the point where to I run over, when it*
> *hit the water surface.*
>
> *I hope it will help. As 2 rotors are working clockwise, the others*
> *non-clockwise, I saw it sunk quite straight. But, maybe the wind*
> *some days later brought it to a different position.On this particular*

> *evening, there was absolutely no wind. Total weight is not more*
> *than 1,3 kilogramms which should be around 0.7 lbs."*

43. On July 25, 2014, at 8:24 p.m., I sent an electronic message from my U.S.

Government e-mail address to "Andreas Meissner <AndiMeissner@web.de>", and it read, in

part, "...your GPS coordinates are great! Thank you. It really helps to narrow our focus, and

seeing your position at the time is very helpful. I thought you were on the other side of the

marina, and the search area is actually a bit different from the one we reviewed in your

photograph. We will expand it accordingly."

E.   The Location and Retrieval of the DRONE

44. On July 28, 2014, I continued the search for the DRONE in Grant Marina, this

time while onboard the 25' NPS Patrol Boat "Eagle" operated by NPS Seasonal Law

Enforcement Park Ranger Robert Elliott. Ranger Elliott and I focused our search within the area

bordered by the GPS coordinates, as marked by Waypoints C and D,[30] provided by MEISSNER

in his e-mail on July 23, 2014 at 6:45 a.m.

45. At approximately 1:15 p.m. (on July 28, 2014), Ranger Elliott spotted what

appeared to be a light-colored, x-shaped object at the bottom of the Grant Marina, and he marked

the coordinates using the Garmin GPS map® 535 Freshwater Chartplotter on board the "Eagle".

The coordinates, saved as N 44°23.536' W110°33.009',[31] put the object within the area bordered

by Waypoints C and D.

---

[30] The GPS coordinates for Waypoint C, converted to UTM, are N 12 T 535869 E 4915532 N; and the coordinates for Waypoint D are UTM N 12 T 535820 E 4915537 N.

[31] Converted to UTM, the coordinates are N 12T 535828 E 4915541 N.

46. I confirmed the sighting of the object using a MarCum Technologies VS380 Underwater Camera Viewing system, and using the camera cable, I determined the approximate depth of the object was 13'10".

47. On July 30, 2014, at approximately 1:30 p.m., as NPS Seasonal Law Enforcement Park Ranger Jacob Poley operated the NPS Patrol Boat "Eagle", Ranger Elliott dove from the "Eagle" into the water, photographed the object at the bottom of the Grant Marina.[32] retrieved the object, brought it back to the surface, and handed it to me.

48. I determined the object was, in fact, a drone; and I assumed custody of the object and seized it as (1) evidence of a crime and (2) property used in committing a crime[33] based on the investigation to date and the following:

a.   The object, with its four propellers, is similar in color – white, but without the red stripes – and similar in shape and design as the "PHANTOM 2" image featured on the predominantly white box with the red handle received by Roy E. DeWalt from MEISSNER on July 18, 2014.[34] The name "PHANTOM" is molded on one side of the object, and the approximate dimensions of the object are 19.25" W x 11.25" D x 7.50" H.

b.   The object was in the water at the bottom of Grant Marina and left unattended for at least 12 days before it was recovered,[35] and inserted within the object is what appears to be

---

[32] Ranger Elliott used a GoPro® Hero Digital Camera secured in a waterproof housing.

[33] Federal Rules of Criminal Procedure, Rule 41(c)(1) and Rule 41(c)(3).

[34] As reported in DeWalt's handwritten statement, dated July 19, 2014.

[35] According to **36 CFR, Chapter I, Part 2 – RESOURCE PROTECTION, PUBLIC USE AND RECREATION, §2.22 Property:**

    (a) **The following are prohibited:** *(emphasis added)*
    (1) Abandoning property.
    (2) **Leaving property unattended for longer than 24 hours** *(emphasis added)*, except in locations where longer time periods have been designated or in accordance with conditions established by the superintendent.
    (3) Failing to turn in found property to the superintendent as soon within the object is what appears to be

a battery - approximate dimensions 1.90" W x 1.40" D x 5.0" H - with the following

information listed on one side:

> "*PHANTOM*
> *Intelligent Flight Battery*
> *5200mAh*
> *(57.72Wh)*
> *11.1V*
> *LiPo*
> *HIGH PERFORMANCE BATTERY*
> *MODEL NO.*
> *733496 5200mAh-11.1V*
> *OPERATING TEMP.*
> *CHARGE: 0'C~60'C"*

     c.  I conducted an Internet search of "PHANTOM 2" using the search tool

available at Google.com, and the search led me to the website of the developer and manufacturer

of the PHANTOM 2, DJI Innovations.[36]  The technical specifications page for the PHANTOM 2

shows the "*Ready to Fly, Multifunctional Quad-rotor System*" is powered by a "*DJI Smart*

*Battery*" and that the type of battery is "*3S LiPo*", which - in the context of rechargeable batteries

- is an abbreviation for Lithium Polymer.

     d.  Mounted on the bottom of the object - with the mount partially wrapped in

gray-colored tape - is what appears to be a digital camera featuring the name "HERO3+" located

beneath a lens on the front.  The approximate dimensions of the camera are 2.25" W x 0.75" D x

1.60" H.  An Internet search of "HERO3+" using the search tool available at Google.com led me

to the GoPro® website,[37] and based on the images and description featured on the website, I

---

     (b) *Impoundment of property.* (1) Property determined to be left unattended in excess of an allowed period of time may be impounded by the superintendent.
     (2) Unattended property that interferes with visitor safety, orderly management of the park area, or **presents a threat to park resources** *(emphasis added)* may be impounded by the superintendent at any time.

[36] http://www.dji.com/product/phantom-2

[37] http://gopro.com/cameras/hd-hero3-black-edition

confirmed the digital camera is a GoPro® HERO3+ Black Edition, capable of "*Professional video quality*"[38] and "*Powerful photo capture*".[39]  Additionally, based on information provided on the GoPro® website's technical specifications page for the HERO3+ Black Edition, a "*microSD Class 10 memory card (is) required*" for storing content captured by the camera.

F.  Preserving the Evidence

49. On July 30, 2014, after seizing the DRONE with the digital camera attached, I consulted over the telephone with Sean O'Brien, the Director of the Rocky Mountain Regional Computer Forensics Laboratory,[40] to ask him for guidance on preserving the electronic evidence (of a crime) I had probable cause to believe was stored on the micro SD card found fully inserted into the camera.  After speaking to his associates, O'Brien told me that he would recommend removing the micro SD card to prevent corrosion from accumulating on the card as it dries.

50. On July 30, 2014, at approximately 7:00 p.m., I removed the micro SD card found fully inserted into the "MICRO SD" slot of the GoPro® HERO3+ digital camera.  I wiped the card dry and then allowed the card to dry further before sealing it as a separate item of evidence.[41]

---

[38] The GoPro® website states, "*High-resolution, high-frame rate 1440p48, 1080p60, 960p100 and 720p120 video modes result in professional quality footage and allow for liquid-smooth slow motion playback. 4Kp15 and 2.7Kp30 enable ultra high-resolution, cinema quality capture.*"

[39] The Go Pro® website states, "*The HERO3+ Black Edition captures gorgeous 12MP stills at up to 30 frames per second—perfect for fast-action sequences. Time Lapse mode enables automatic photo capture at 0.5, 1, 2, 5, 10, 30 or 60 second intervals. Continuous Photo shoots full-resolution stills at a steady 3.5 or 10 frames per second when holding down the shutter button.*"

[40] According to its website, the Rocky Mountain Regional Computer Forensics Laboratory has been accredited by the American Society of Crime Laboratory Directors since 2008.

[41] The micro SD card is further described as a SanDisk Ultra® 32 gigabyte microSDHC™ UHS-I Memory Card featuring a Class 10 video rating for high-quality video recording.  The card is approximately 9/16 inches wide, 6/16 and 7/16 inches deep, and 1/16 inches tall.  The top portion of the front face of the card is red in color, with the letters "SanDisk" and "Ultra" featured in white.  The bottom portion of the front face of the card is gray in color,

G.  Taking Ownership of the DRONE

51. On July 30, 2014, at 8:22 p.m., I sent an electronic message from my U.S.
Government e-mail address to "Andreas Meissner <andiMeissner@web.de>", advising
MEISSNER the Phantom 2 had been located and retrieved. I wrote, "…we are allowing all the
components to dry. Fortunately, it crashed into a fresh water lake. I also removed the 32 GB
SanDisk Ultra Micro SD card from the GoPro to let it dry separately and out of the camera. The
card appears unharmed…I took some photographs of our little adventure, and I attached them to
this e-mail as a pdf file. Please let me know - and I certainly hope we do - that we have, in fact,
retrieved the correct Phantom 2 and GoPro!"

52. The pdf file[42] contained copies of a total of eight (8) color photographs, including
one (1) photograph taken by Ranger Elliott of the DRONE at the bottom of the Grant Marina,
one (1) photograph taken by Ranger Poley of Ranger Elliott holding the DRONE above the
surface of the water, and six (6) photographs taken by me of the top, bottom, and sides of the
DRONE on a walkway adjacent to the Grant Ranger Station.

53. On July 31, 2014, at 1:51 p.m., I received an electronic message sent from
"**Konvex TV Andreas Meissner** <andimeissner@web.de>" to my U.S. Government e-mail
address, and it read, in part,

> "***This device on your picture is definitely mine. I've taped the
> stabilizer (emphasis added)***, 'cause it was not working properly on
> horizontal axis."

MEISSNER also wrote,

---

with the letters and numbers "32GB" and "microSDHC I", as well as the symbol for Class 10 all featured in white.
The back face of the card is black, with eight, gold-colored metal contacts. Also featured on the back face of the
card are the numbers and letters "4181CMRUYOYY" and "BM MADE IN CHINA" printed in yellow.

[42] "pdf" is an abbreviation for Portable Document Format.

> "*I would be really glad, if you could send the SD-card within next days, 'cause I'm already editing the material. However, after drying out please feel free to copy **the last 4 or 5 files, which are made in the park...**" (emphasis added)*

54. On August 01, 2014, at 12:42 a.m., I sent an electronic message from my U.S. Government e-mail address to "Andreas Meissner <andiMeissner@web.de>", and it read, in part, "As for your SD card...I am working on acquiring the services of someone who knows more about computers than I do.  I'd hate to ruin your files.  I know it's an SD card and I've used them quite a bit, but because it was submerged in water for so long, I think it would be best if we found just the right person who can do it without damaging any files."

55. On August 01, 2014, at 2:05 a.m., I received an electronic message sent from "**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the message read, in part,

> "*Thats a good idea. But if it is to hard to find someone or if it takes to many time you could just send it back and I will provide the files to you after recovery.*"

56. On August 02, 2014, at 9:55 a.m., I received an electronic message sent from "**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the message read, in part,

> "*It could be helpful, if you could send the platform and sd card within next days, 'cause I found some hints to save damaged SD Cards, Phantoms and Gopros. But they are all call it most important to do complete dismantling and special drying within days to prevent electronics from rust.*
>
> *I would send the saved files later to you on DVD, for example*"

57. On August 02, 2014, at 5:02 p.m., I sent an electronic message from my U.S. Government e-mail address to "Andreas Meissner <andiMeissner@web.de>", and it read, in part, "The recovery of your Phantom drew much attention from many corners of Yellowstone

National Park, and the topic of permits surfaced again. I have checked with the Fee & Film

Program Manager here in the Park, and there is no record of a Yellowstone National Park

Service permit for photography or a permit to operate an unmanned aircraft system issued to you

or the bicycling group called Run & Ride for Reading led by Mr. Oliver Gritz. We also spoke to

National Park Service employees at the West Entrance, including Randall Henderson, and at no

time did they give you or anyone associated with the group a written permit or verbal

authorization to photograph - using what was described as a 'large camera' - for the purposes of

filming a documentary, for-profit or non-profit, or to operate an unmanned aircraft system,

commonly referred to as a drone. According to their written reports, they advised that you

and/or other members of the group needed to seek further clarification before any such activity

would be allowed. In one of your earlier e-mail messages to me, you wrote that you left

documents in your rental vehicle before you departed the United States. Do you have copies of

any of those forms? Diana at the Back Country Office told me you showed her what you said

was a permit to film a documentary. She told me she did not see an official National Park

Service header or emblem on the form you presented. Do you still have that and can you scan it

and send me a copy? Speaking of the Back Country Office, you told Roy and Diana that you

were on a kayak at the time your Phantom went into the water."

  58. On August 03, 2014, at 2:48 p.m., I received an electronic message sent from

"**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address, and the

message read, in part,

> "*I'm familiar with your park-regulations. And if I would have*
> *violated it, I would know. And in that case, I would have never*
> *asked you for such tremendous help. I would have left the phantom*
> *in the lake and noone told about it.*

*First of all: the documents: __I never had a filming permission and__*
*__I´ve never claimed that.__  (emphasis added)  I had a paper from*
*Randell Henderson (which he still should have in copy) which*
*said, that there are some cyclists coming to the park for charity*
*reasons.*

*When we entered the park on 17th of July, Mr Henderson came out*
*of his office and told the lady in the box office, that we don´t have*
*to pay entrance fee. Than he handed out the paperwork. While the*
*cyclist headed on, I was not shure, if this paperwork would be*
*enough for filming. So I went back to the entrance and asked Mr.*
*Henderson to come out for a second time. There was another lady .*
*I can´t remember her name.*

*I said to them: I´ve a little problem: I don´t see a filming*
*permission but we wanna do for this documentary. Randy asked:*
*profit or non profit? I told him about the charity project. He said:*
*You don´t need a permission for that. I said: But as we usually do*
*that professionally, the camera is quite big and we even have a*
*flying device for lowrange flights.  He said: Just fill in your name*
*and sighn this paper an have it with you, if there should be any*
*confusion. I did and left it later in the rental car. Unfortunately the*
*only copy which was signed by me. It was the paper I´ve showed to*
*Roy and Diana.  I´ve trusted in that; and be shure that I would´nt*
*have been filming without that chat to Mr. Henderson. It´s really*
*bad, that I now can´t prove these facts, because I thought it would*
*be enough to trust in his words. As you don´t know me personally,*
*I can understand that you may believe more in their words than in*
*mine. But   I swear, that I´m telling the truth. Even if you would do*
*investigations and blame me for violations, I would´nt have any*
*chance to defend, as long as people not remember, what we were*
*talking about at the west entrance.*

*The second thing: I really can´t explain, why Roy and Diana still*
*think I was on a kajak. I´ve never said that and it´s not true. I´ve*
*been at the marina close to sunset; almost no other people there,*
*Where should I´ve got the kajak from? And when you remember*
*the point you saved the phantom you will see, that it doesnt make*
*any sense to operate from a kajak at that point of the marina. I*
*won´t claim that Roy and Diana are telling wrong facts, ´cause*
*they were so nice and helpful and did immediately all they could.*
*Maybe it was just a misunderstanding, ´cause my spoken English is*
*not so good. Once again: No kajak.*"

59. On July 25, 2014, Ranger Mengak obtained a typed statement, dated July 24, 2014, signed by Beth L. Gibson, an NPS Visitor Use Assistant (VUA) assigned to the West Entrance Station, Yellowstone National Park. Two days later, on July 27, 2014 at 1:42 p.m., I sent an electronic message from my U.S. Government e-mail address to Gibson with an attachment of the scanned copy of the "FEDERAL REPUBLIC OF GERMANY IDENTITY CARD" featuring the color photograph of the individual listed with the names "MEIβNER" and "MEISSNER".[43] I asked Gibson to review the photograph, and in an e-mail I received from Gibson on July 27, 2014 at 4:10 p.m., Gibson said she was "*reasonably certain*" the individual featured in the photograph is the same individual - described as "*a representative of the cyclist group*" - who engaged Randall Henderson in a conversation regarding "*filming of the group*" on July 17, 2014 at the West Entrance Station. Gibson wrote, "*Randy clearly responded that filming not be commercial, that it not violate closures, impact resources, or have an adverse effect on park visitors. Randy also recommended that the person contact the number at the bottom of his form to get further clarification. He did not ask about the use of a drone nor did Randy or I ask if he planned to use a drone.*"

H. Search Warrant and Search

60. On August 13, 2014, a Search Warrant was issued out of the U.S. District Court for the District of Wyoming by U.S. Magistrate Judge Mark Carman authorizing a search of the micro SD card (more specifically, the SanDisk Ultra® 32 gigabyte microSDHC™ UHS-I Memory Card, number 4181CMRUYOYY, hereinafter the "MEDIA").

---

[43] This is the same file I received attached to an electronic message sent from "**Andreas Meissner** <AndiMeissner@web.de>" to my U.S. Government e-mail address on July 21, 2014 at 6:14 a.m.

61. On August 18, 2014, at approximately 1:15 p.m., I initiated a search of the

MEDIA at the Rocky Mountain Regional Computer Forensics Laboratory (RMRCFL) in

Centennial, Colorado; and I seized a total of twelve (12) files that fell within the scope of the

search warrant, including:

    a. <u>GOPRO050.MP4 (7/17/2014 2:08:26 PM 994.985 MB)</u>

"The GOPRO050.MP4 video file is four minutes and 36 seconds
long (4:36). Based on the investigation to date, the video was
captured and then stored on the MEDIA by a GoPro® HERO3+
Black Edition digital camera mounted to an unmanned aircraft
(hereinafter the "DRONE"). The video indicates the DRONE was
launched from, operated over and landed within the boundaries of
Yellowstone National Park. More specifically, based on further
examination of the video, the DRONE was launched from a pull-
out along the Grand Loop Road in the Midway Geyser Basin area
of the Old Faithful District. Satellite imagery and mapping tools
available at geoplaner.com show the approximate GPS coordinates
of the launch point are UTM N 12T 513196 E 4930321 N. The
DRONE was then operated, i.e. flown, over moving vehicular
traffic along the Grand Loop Road, which also serves as U.S.
Routes 20, 89, 191 and 287 through that portion of Yellowstone
National Park. The DRONE continued over the Firehole River
before reaching and then flying over the Excelsior Geyser Crater.
The Grand Prismatic Spring could also be seen. Also videotaped
as the DRONE flew overhead were numerous visitors walking
along the boardwalk that borders both the Excelsior Geyser Crater
and the Grand Prismatic Spring. After its flight, the DRONE
landed near its launch point."

    b. <u>GOPRO051.MP4 (7/17/2014 5:28:14 PM 1096.973 MB)</u>

"The GOPRO051.MP4 video file is five minutes and four seconds
long (5:04). Based on the investigation to date, the video was
captured and then stored on the MEDIA by a GoPro® HERO3+
Black Edition digital camera mounted to a DRONE. The video
indicates the DRONE was launched from, operated over and
landed within the boundaries of Yellowstone National Park. More
specifically, based on further examination of the video, the

DRONE was launched from a pull-out along Grant Village Drive
in the Snake River District.  Satellite imagery and mapping tools
available at <u>geoplaner.com</u> show the approximate GPS coordinates
of the launch point are UTM N 12T 534408 E 4915133 N.  The
DRONE was then operated, i.e. flown, above the pull-out as a
group of twelve (12) bicyclists (at 2:05) were videotaped riding
toward and past the DRONE along Grant Village Drive.  The
DRONE was then flown well above the tree line, and a wide area
of Yellowstone National Park could be seen, including the local
National Park Service (NPS) Maintenance Yard, NPS Government
Housing Area, the NPS Ranger Station, and Yellowstone Lake.
After its flight, the DRONE landed near its launch point."

c.   GOPRO052.MP4 (7/17/2014 5:31:14 PM 467.054 MB)

"The GOPRO052.MP4 video file is two minutes and nine seconds
long (2:09).  Based on the investigation to date, the video was
captured and then stored on the MEDIA by a GoPro® HERO3+
Black Edition digital camera mounted to a DRONE.  The video
indicates the DRONE was launched from, operated over and
landed within the boundaries of Yellowstone National Park.  More
specifically, based on further examination of the video, the
DRONE was launched from a pull-out along Grant Village Drive
in the Snake River District.  Satellite imagery and mapping tools
available at <u>geoplaner.com</u> show the approximate GPS coordinates
of the launch point are UTM N 12T 534408 E 4915133 N.  The
DRONE was then operated, i.e. flown, well above the tree line, and
a wide area of Yellowstone National Park could be seen, including
the local NPS Maintenance Yard, the NPS Government Housing
Area, and Yellowstone Lake.  After its flight, the DRONE landed
near its launch point."[44]

---

[44] As excerpted from my Supplemental Case / Incident Record, case number NP14086555, of the search on August
18, 2014.

VI. CONCLUSION

62. Based on the foregoing, I submit there is probable cause to believe that ANDREAS MEISSNER, aka ANDREAS MEIBNER, violated 36 CFR §1.5(f) *Violating a closure, designation, use or activity restriction or condition, schedule of visiting hours, or public use limited is prohibited (launching, landing or operating an unmanned aircraft)*; 36 CFR §5.5(a) *Commercial filming and still photography activities*; 36 CFR §2.22(a)(2) *Leaving property unattended for longer than 24 hours*; and 36 CFR §2.32(a)(4) *False Report - Knowingly giving a false report for the purpose of misleading a government employee or agent in the conduct of official duties*.

63. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Steven G. Noh
NPS Law Enforcement Park Ranger

Sworn and subscribed to before me this _26_ day of August 2014

Honorable Mark Carman
United States Magistrate Judge

